Exhibit 31

STATE OF VERMONT
PUBLIC UTILITY COMMISSION

Case No. 22 -2442-PET

| | |
|---|---|
| Petition of Industrial Tower and Wireless, LLC requesting a certificate of public good, pursuant to 30 V.S.A. § 248a, authorizing the installation of wireless telecommunications equipment in Ira, Vermont | |

**NEIGHBOR INTERVENORS' BRIEF**

Now come Neighbor Intervenors Stanley Shapiro, David Gates, Francis & Ellen Lloyd,

Alta Johnston, and Raymond Gandy, *pro se,* and hereby submit our Brief with Exhibits on the

proposal by Industrial Tower and Wireless LLC (ITW) to construct a lattice tower for Motorola

Motorolo Wide-Area Two-Way Radio antennas on property owned by Stephen Pietryka of

Toppin Road, in the viewshed along Route 133 in Ira, Vermont.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Introduction | 2 |
| Project Description Findings of Fact | 4 |
| Discussion | 6 |
| Aesthetic Assessment | 7 |
| Aesthetics Findings of Fact | 7 |
| Aesthetics Discussion and Part 1 of the Quechee Analysis | 8 |
| Part 2 of the Quechee Analysis | 20 |
| Orderly Development of the Region | 27 |
| Orderly Development Findings of Fact | 27 |
| Societal Benefit | 32 |
| Legal Standard | 34 |
| Conclusion | 35 |

**Exhibits:**

| | |
|---|---|
| NI-B-1 Photos with Descriptions | NI-B-8 Shapiro Spring Video |
| NI-B-2 Ira Town Plan | NI-B-9 Shapiro Summer Video |
| NI-B-3 Rutland Regional Plan | NI-B-10 Shapiro Fall FoliageVideo |
| NI-B-4 Shapiro Affidavit | NI-B-11 Gates Video |
| NI-B-5 Lloyds Affidavit | NI-B-12 Gates Video |
| NI-B-6 Bonner/Gates Affidavit | NI-B-13 Tymiski Affidavit |
| NI-B-7 Gandy Affidavit | NI-B-14 Vermont 10-Year Telecom Plan |

**Introduction**

Industrial Tower and Wireless LLC (ITW) is new to Vermont, having received CPGs for towers in Eden and Fairfax in cases that were not contested and received no public comment. Prefiled Testimony submitted by ITW in this case indicates the company has also received a CPG for a tower in Essex. We are unable to find a record of the Essex tower in ePUC. ITW is proposing a tower in Enosburgh that is being contested through the PUC process.

In its presentation, ITW indicates the company's goal to start the build-out of its Enhanced Specialized Mobile Radio (ESMR) network in North Vermont, with plans to continue to expand south. Ex. KD-5 p. 23. ITW's presentation says that the company's goals for growing the network "align with community values." Ira community members are not experiencing ITW's approach to be aligned with the town's community values. Ex. KD-5 p. 23.

The Town of Ira is located in southern Vermont, not Northern Vermont.

Ira townspeople were not notified of the March, 2022 balloon test, and were not offered the opportunity to have simulations created from private property vantage points. Ex. NI-B-6. The leasing landowner's outreach to adjoiners in the spring of 2022 indicated the plan was for a tower for cellular phone service. Ex. NI-B-4, -6. The few people who were contacted indicated support as long as it was not an intrusive structure and expressed support for something like a monopole. Ex. NI-B-4. Some neighbors were told it would be a 100-foot tall tree tower. NI-B-5. When the petition was filed, neighbors felt they were misled. Ex. NI-B-4, -5, -6, -14.

In its submission of "relevant portions of the Ira Town Plan," ITW failed to include the Scenic Resources portions of the Town Plan. Ex. LH-6.

Alignment with community values would involve 1) meeting with the town Select Board and Planning Commission first, before signing a lease with a landowner, 2) providing accurate

information to neighbors about the type of tower and service to be provided, 3) publicly noticing the balloon test and requesting access to private property to provide accurate simulations and 4) recognizing the scenic beauty of the area in which the tower is proposed and offering all possible mitigation and 5) respecting the Town Plan by presenting and addressing its Scenic Resource section as relevant to this proposal.

ITW has not provided an Aesthetics Analysis and has not evaluated the proposal's aesthetic impact using the Quechee Analysis.

ITW's documents are repetitive, sloppy, and show a lack of attention to details.  ITW says it is starting to build out its network in northern Vermont.  This tower is proposed for southern Vermont.  A 150-foot balloon test referenced in testimony was said to be a typo, but more likely the document was copied and pasted from the Enosburgh tower project document. ITW's Response to Comments refers to the "Police Department" (a reference to the St. Albans Police Department from Enosburgh tower case?) when the correct reference in the ITW Ira tower case is to the Regional Ambulance Service.  ITW's Delaney's Prefiled Testimony says the facility is on a portion of the approximately 20-acre parcel of land owned by the Pietrykas. Parcel mapping https://maps.vermont.gov/vcgi/html5viewer/?viewer=vtmapviewer shows it is an 81-acre parcel.  This type of carelessness on the part of a company new to Vermont claiming to have a business that is aligned with Vermont's community values raises serious questions about how the company would operate should it receive a CPG for this tower in Ira.

This Brief will provide Findings of Facts and Discussion with Exhibits to show that the proposed tower would create undue adverse aesthetic impacts that are not outweighed by societal benefits, and the proposed tower interferes with Orderly Development of the region.  Therefore, the tower should be denied.

## Project Description Findings of Fact

1. Industrial intends to construct a telecommunications facility on a portion of the approximately 20-acre parcel of land owned by Stephen and Colleen Pietryka off of Toppin Road in Ira, Vermont.  Delaney PfT p. 2

2. The Project will provide the needed coverage and capacity to allow Industrial subscribers living in, working in or passing through the Ira area to be able to use Industrial's network. Delaney PfT p. 2

3. Industrial will create an 80' x 80' "Compound" enclosed by an 8' high chain link fence, with a locked gate. Within the Compound, Industrial will construct a 170' above ground level ("AGL") telecommunications self-supporting lattice tower ("Tower"). Six (6) thin "whip" antennas ("Antennas") will be mounted at 170' AGL of the Tower. Five (5) transmit Antennas will extend upward to a maximum height of 183.0' AGL. The receive Antenna will reach downward from the 170' AGL mounting level. Each Antenna will measure approximately 13' long and 2.75" in diameter.  Delaney PfT pp. 2-3

4. Intervening terrain causes a sharp drop off in coverage to both the existing sites north and south of the proposed tower. Delaney PfT p. 3

5. Access improvement include relocating and widening the existing access route and stabilizing the roadbed. Voci PfT p. 3

6. The Access and utilities will run within a 25' wide access and utility easement. Voci PfT. p. 3

7. Underground utilities will follow the Access from the closest existing utility connection point on Toppin Road to the Compound and will be placed in a trench adjacent to the Access. Voci PfT. p. 3

8. The contractor will limit clearing to the minimum required to construct the Access and Compound, which is estimated to be approximately 10,529 square feet. Voci PfT p. 3

9. The Project area may be classified as a headwaters area due to steep slopes, shallow soils and limited drainage area. Hodgetts PfT p. 3

10. The existing access to a camp parallels an unnamed tributary to Ira Brook. The project proposes to reconfigure the existing driveway and widen the travel portion of the road. The road will be relocated outside the 50' riparian buffer and the existing road within the buffer will be abandoned and allowed to naturally revegetate.  Hodgetts PfT p. 4

11. An overhead utility line extension will be installed outside of the buffer and then run underground to the tower compound. Hodgetts PfT p. 4

12. Wetland classifications have not been verified by the district VT DEC Ecologist. Hodgetts PfT p. 5

13. The effective increase in impervious area is approximately 15,728 square feet. Hodgetts PfT p. 5

14. The telecommunications services that ITW will provide through the Project will primarily be targeted to business customers seeking a reliable, reasonably-price means of communicating between their offices and remote users. Hodgetts PfT. P.11

15. The Agency recommends Petitioner append the results of its rare, threatened, and endangered plant survey to its petition.  ANR letter Aug. 11, 2022

16. Since the filing of the Public comments and those of the PSD, ITW has obtained the commitment of the Rutland Regional Ambulance Service ("Ambulance Service") to place its antennas and equipment on the tower ("Tower") portion of ITW's proposed

facility. In light of the **Police Department's** commitment, ITW has presented an even stronger case that the approval of its Petition will be in the public good. Consolidated Response, p. 1 *[emphasis added]*

17. In further communications with the Ambulance Service, ITW stated its commitment to allow the Department to place its equipment on the Tower rent-free. Consolidated Response p. 2

18. ITW conducted propagation analyses that concluded that a Tower height of 170' above ground level ("AGL") is the minimum necessary to provide optimal coverage on its network in the Ira area. Consolidated Response p. 5

19. ITW intends to make space available on its Tower to as many as five competing wireless communications providers and to the **Police Department**. Consolidated Response p. 5 *[emphasis added]*

20. ITW's choice of height stems primarily from its need to mount its antennas at a sufficient height to attain its coverage objectives. Consolidated Response p. 5

21. ITW will construct the Tower regardless of whether it has commitments from other wireless providers. Consolidated Response p. 5

22. ITW is seeking to expand this network to Vermont. Delaney Sup.PfT p. 2

23. The ultimate goal of this network of sites is to provide reliable wide-area ESMR services to all of Vermont, to eventually connect with existing ITW sites that are providing coverage in Massachusetts and New Hampshire. Delaney SupPfT p. 3

24. ITW designed the Tower, including its foundation, structural components and adjacent "compound," to accommodate up to five (5) additional wireless communications carriers. Delaney SupPfT p. 4

25. In further communications with the Ambulance Service, ITW stated its commitment to allow **the Department** to place its equipment on the Tower rent-free. Delaney SupPfT. p. 5 *[emphasis added]*

26. Industrial owns and operates Motorola Motorolo Wide-Area Two-Way Radio Networks in New England and South Florida. Ex. KD-5, p. 4

27. Pages 20 and 21 of Ex. KD-5 show monopole towers, not lattice towers.

28. Innovations in Vermont. Our goals for growing our network align with community values and meet vital communications needs in Vermont. Our goal is to start the build-out of our network in North Vermont, where the need for coverage is most vital, with plans to continue to expand south. Ex. KD-5 p. 23

29. ITW has only recently begun its siting activities in Vermont. Delaney Sup. PfT p. 1

30. ITW will be applying for more facilities in the near future. Delaney Sup PfT p. 1

31. ITW conducted propagation analyses that concluded that a Tower height of 170' above ground level ("AGL") is the minimum necessary to provide optimal coverage on its network in the Ira area. Delaney Sup. PfT. p.4

32. Regional Ambulance would be interested in reviewing information regarding the possibility of improved radio communications. Ex. KD-7

**Discussion**

ITW proposes to construct a 170-foot tall lattice communications tower with 13-foot whip radio antennas in the scenic, historic, rural, agrarian, sparsely populated town of Ira. The developer seeks to have the tower permitted exclusively for the two-way radio service that is the business of ITW, with the possibility of leasing space to up to 5 carriers. The primary beneficiaries of the tower's approval would be the leasing landowner and ITW's business customers. ITW does not have commitments from cellular telephone antenna service providers. ITW erroneously claims that it "has obtained the commitment of the Rutland Regional Ambulance Service to place antennas and equipment on the tower," Consolidated Response p. 1. However, the Regional Ambulance Service's letter simply expresses support and says they "would be interested in reviewing information *regarding the possibility of improved radio communications.*" Ex. KD-7 *(emphasis added)*. ITW has not obtained the claimed commitment of the Rutland Regional Ambulance Service to place antennas and equipment on the tower.

Initial outreach to neighbors of the tower site in Ira by the tower-leasing landowner and ITW indicated that the tower would be for cellular telephone service. Neighbors were okay with something unobtrusive such as a monopole. Ex. NI-B-4. When the application was filed for a 170-foot tall lattice tower with 13-foot whip antennas for two-way radio service, it came as a surprise to the people living in the neighborhood that the height, design and type of service being applied for were not what they were told. Ex. NI-B-4, -5, -6, -14.

ITW's Exhibit KD-5, pages 20 and 21 show monopoles have been used by ITW in other states. However, ITW has applied for a lattice tower and has not offered any alternatives to mitigate the visual impact.

ITW's pre-filed testimony indicates that wetlands classifications had not been verified. No supplemental information on that topic has been submitted into the record. ITW has not complied with ANR's recommendation to append the results of the Rare, Threatened or Endangered Species plant survey to its petition.

## Aesthetic Assessment

ITW's Aesthetics Assessment was limited to a visibility analysis conducted without public notice. ITW conducted a balloon float that was not noticed to the public. ITW did not contact landowners to seek permission to enter their property and take photos from their houses or other vantage points at the time of the balloon float. ITW admits that the tower would be visible from the Gates/Bonner, Gandy, Johnston, Shapiro and Lloyd properties, a property .90 miles south of the project, and would be visible along a two-mile stretch of Route 133. The owner of the leasing property opposed neighbors' request to enter the property and raise a balloon. ITW would not compel the landowner to allow entry. ITW did not conduct a Quechee Analysis to address the visual impact on aesthetics.

## Aesthetics Findings of Fact

33. The population density is quite low. Delaney PfT. p. 3
34. A visibility analysis was conducted to review the potential visibility of the proposed installation, and a balloon float was conducted on March 30, 2022 to confirm the visual impact of the proposed Tower on the surrounding community. Hodgetts PfT. p. 7
35. The tower will be visible along a two-mile stretch of Vermont Route 133. Hodgetts PfT. p. 8
36. We are, therefore, addressing the relevant provisions of the Town of Ira Town Plan (adopted by the Town of Ira Selectboard April 21, 2020) ("Town Plan") and the Rutland Regional Plan (adopted June 19, 2018) ("Regional Plan") to illustrate that the proposed Project will comply. Hodgetts PfT. p. 8
37. Johnston, Lloyd and Shapiro should be consistent with those depicted in Viewpoints 1 and 2 and 3 in the Photosims. In those Viewpoints, the Tower is visible, Hodgetts Sup. PfT p. 1
38. There are portions of the Gates/Bonner and Gandy parcels from which the Tower will be visible. Hodgetts Sup. PfT. p. 1

39. We did not have authorization from the landowners to enter their property and take photos from their houses at the time of the Balloon Float. Hodgetts Sup. PfT p. 1
40. ITW did not have authorization from the landowners to enter their property and take photos from their houses at the time of the Balloon Float. Consolidated Response p. 8
41. The owner of the property where the proposed telecommunications facility will be built, Stephen Pietryka, has expressed his opposition to the neighbors' request to enter his property and raise a balloon. ITW can not and would not seek to compel Mr. Pietryka to allow that entry. Supplement to Opposition of ITW, p. 1

## Aesthetics Discussion and Analysis

Under Section 248a(c)(1) the Vermont Public Utility Commission must find that the project will not have an undue adverse effect on aesthetics, considering Criterion 8 of Act 250. Section 248a's Criterion 8 addresses aesthetic impact within the parameters of the Quechee Analysis, which was established to provide a consistent and defensible method for evaluating the aesthetic impacts on projects undergoing Section 248a review.

The Quechee Analysis is a two-step process, which begins assessing the nature of the project, its context, and whether it will lead to adverse aesthetic impacts. This step asks whether the project is in harmony with its surroundings, and the analysis is based on a clear understanding of the nature of the visual impacts. This step must describe the surrounding area of the project and the compatibility of the project with those surroundings. It also asks: 1) whether suitable colors and materials have been used; 2) how visible the project is; 3) how the project affects open space in the area; and 4) whether the project has been proposed for visually sensitive land.

If the conclusion from this first step of the analysis is that the aesthetic impacts of the project will be compatible with its surroundings, then the aesthetic impacts of the project are considered not adverse. If this is not the case, the project is considered to have an adverse impact and the second step of the analysis is required to determine if the adverse impacts are undue. The

second step asks 3 questions: 1) does the project violate any clear, written community standard intended to protect the scenic beauty of the area; 2) does the project appear shocking or offensive to the average person: and 3) has the applicant taken available and reasonable steps to mitigate the identified adverse impacts of the project as proposed? If the answer to question 1 or 2 is yes, or the answer to question 3 is no, then the aesthetic impact of the project is considered unduly adverse under the Quechee Analysis.

**What is the Nature of the Project Surroundings?**

The project is proposed to be located along Route 133 in the Town of Ira, a sparsely populated area. The Town Plan describes Ira as "a very rural and sparsely settled community that has no commercial land and is therefore quite peaceful." Ex. NI-B-2 p. 30. The State highway, Route 133, runs through the Ira valley and links the rural communities of Tinmouth, Middletown Springs and small towns south of Ira to West Rutland to the north. Population density of Ira and the towns using Route 133 is very low.

ITW acknowledges that "the tower will be visible along a two-mile stretch of Vermont Route 133." Hodgetts PfT p. 8.

This part of Ira, known as the Ira valley, is distinguished by open space, farmland in active use, with historic buildings in the foreground and dramatic mountain backdrops. Ex. NI-B-1. The two-mile stretch of Route 133 that would be impacted by ITW's Tower is an unspoiled, agrarian, thriving pastoral landscape with numerous historic buildings on the State Register of Historic Places. Ex. NI-B-1.

Ira's Town Plan's Scenic Resources section describes the specific area, "Scenic resources have aesthetic, historical and economic value, enhancing the quality of life of Ira's residents. There are many pleasing views and vistas available to travelers on the Town's existing highways.

Route 133 extends lengthwise through Ira valley, which contains a large portion of the Town's open and agricultural low lands; the southern portion of the valley is flanked by steep, wooded ridges to the east and west. To the east is the ridge running along the boundary with Clarendon, which includes Susie's Peak. To the west is Train Brook Ridge running along the boundary with Middletown Springs." Ex. NI-B-2 p. 30.

**Is the Project's Design Compatible with its Surroundings?**

The size, scale, and metal materials of the ITW Tower proposal is not compatible with its rural, bucolic surroundings that have no commercial land uses.  As depicted in Exhibit Ex. NI-B-1, traveling from north to south on Route 133 along the two-mile stretch Ex. NI-B-1, p. 1, the Ira Riverside Cemetery comes into view on the east side of the road followed by the Milky Way Dairy on the east side of Route 133 and the farmhouse on the west side of the road. Ex. NI-B-1 p. 2. Views of the tower begin after these historic features.  The center of Ira features the Ira Town Hall c. 1800 and the Ira Baptist Church c. 1845 on the west side of the road, with dramatic mountain views of Herrick Mountain in the background. Ex. NI-B-1 p. 2 Fig. 5. The tower would be prominently visible from the new Ira Town Offices behind the historic church. Ex. NI-B-1 p. 3 Fig. 6., Ex. LH-4 p. 4.   Most of the historic places that are listed on the State Register of Historic Places in Ira are located along the two-mile stretch of Route 133 where ITW's tower would be visible. Ex. NI-B-1 p. 4.

Continuing south of the town center on Route 133, the Lloyd residence is one of several that contain scenic views. ITW's Tower would be in direct view of the Lloyd home and numerous locations on their property and other properties where friends and family hike, snowshoe and recreate in all seasons. Ex. NI-B-1 p. 5. This bucolic area has historic buildings, homes and barns, agricultural fields in the foreground, wooded mountains in the background.

Open space and beautiful landscapes dominate this two-mile stretch of Route 133 in Ira. Ex. NI-B-1 p. 6.

The greatest expanse of open space is the southeastern portion of the two-mile harmonious agricultural and mountainous area along Route 133 in Ira. The centerpiece of this idyllic setting is the Ira Brook horse farm, hosting warm blood horses. Residents, visitors and people traveling through this idyllic stretch of Route 133 in Ira benefit from this scenic resource. Aside from power lines and telephone poles dating back to 1929, homes and barns, there are no commercial or industrial elements in this pristine landscape. Ex. NI-B-1 p. 7. Directly opposite ITW's proposed Tower are two historic homes from which the tower would be visible from numerous perspectives. Ex. NI-B-1 p. 8. The Ira Brook farmhouse and horse farm look out onto undisturbed scenery in all seasons. Ex . NI-B-8, -9, -10. ITW's 183-foot tall lattice tower would be in the direct view of the horse farm, historic homes, and drivers traveling along Route 133 in Ira. Ex. NI-B-1 p. 9.

The total height of the lattice tower with antennas would be more than 100 feet taller than the average tree height, and would not be compatible with the rural scenic nature of the area. A project of this size and scale is not compatible with its surroundings or the expectations of this area, as expressed by the local residents Ex. NI-B-4, -5, -6, -7, -14 and the Ira town plan. Ex. NI-B-2. The change in character and intrusion of a tall metal structure with protruding antennas into natural, scenic views of forested mountains in the background and open space foregrounds of agricultural fields flanked by historic buildings will potentially be offensive to those who live here and will experience this change daily. The project's height will introduce a new and foreign, industrial element into the bucolic landscape that is not commonly seen or expected and would require specific and effective mitigation measures to guarantee it would not dominate or

diminish the setting, and to ensure that the perceived value and visual quality of the area is not irreversibly damaged. To that end, the project's design as currently proposed would be adverse.

**Are the colors and design selected for the project suitable for the context within which it is located?**

The colors and materials proposed for this project are suitable for an area with industrial structures. However, the galvanized steel and gray color are incompatible with the extraordinary natural beauty of the landscape where the tower is proposed to be located. The base of the tower will be less visible and will blend in with surrounding tree cover. The tower itself, looming more than 100 feet above tree height, will not be absorbed into the background vegetation and will stand out as discordant, inharmonious and jarring to the average viewer. Views of the tower from neighboring residences, properties and travelers along Route 133 will not be mitigated solely by the color of the tower. No steps have been taken to mitigate the views of the proposed tower. Given these factors, the colors and design selected for the project are adverse.

**What is the project's impact on open space?**

Open space can be defined as any piece of land that is undeveloped (has no buildings or other built structures) and is accessible to the public or contributes to open space views accessible to the public.

The 183-foot tall lattice galvanized steel tower with antennas would add a new, unique industrial element to the public's open space views along Route 133. As travelers move from south to north or north to south, both sides of the road offer views of farmland and dramatic mountain vistas. The open space is greatest in the immediate area where ITW proposes to erect the tower. Given the tower's jarring incompatibility with the surrounding area's open space, the project will have an adverse impact on open space.

**Where is the project visible from?**

"...the tower will be visible along a two-mile stretch of Vermont Route 133". Hodgetts

PfT p. 8.

The specific two-mile stretch of Vermont Route 133 is shown in the Google Earth image

below. The view is looking south, with the yellow pushpin in the location of the proposed 170-

foot lattice tower with 13-foot antennas for a total height of 183 feet. The project's viewshed

extends half a mile south of the area shown by the red line, as shown in ITW's simulation, Ex.

LH-4, p. 10, depicting prominent views of the tower from a residence identified as .90 miles

from the project.



ITW submitted only four simulations. Because of the gray trees and gray tower, ITW's

simulations greatly minimize the aesthetic effects on the viewshed from public and private

vantage points.

There is some restriction in specific locations due to shrubbery and trees, but the majority of the properties along Route 133 would have some views of the project, whether from residences, town buildings, the church, barns, open space, and higher elevations on surrounding mountains. Common uses of the properties in this area include hiking, snow shoeing, cross country skiing, maple sugaring, snowmobiling, mountain biking and hunting, adding to the many visibility points of the tower for the landowners, tourists, and the community. Many landowners with properties that would have a view of the tower may have no knowledge of ITW's tower proposal.

The tower would be visible from the new Ira Town Office behind the historic church in the center of Ira, as shown in ITW's simulations. Ex. LH-4, p. 4. Every resident and taxpayer of Ira who uses the town office for deed research, paying taxes, registering dogs, etc. would be exposed to the tall metal lattice tower topped with whip antennas.



Tower

ITW's simulation shows the tower would be prominently visible from Route 133 south of

the town center where beautiful historic barns and mountain views dominate the scenery.



Ex. LH-4, p. 6

The ITW tower would be visible from Francis and Ellen Lloyd's residence on Route 133,

and from numerous areas on the Lloyd's property including higher elevations.  Ex. NI-B-5.



Tower

An industrial tower would be out of character with this scenic area from the Lloyd's perspective.

The visibility of the ITW tower would be especially dominant from the two historic homes and horse farm to the immediate west of the tower site.  Ex. NI-B-4.



The specific location of the tower draws the attention of the eye due to the complex topography of this specific area of the Taconic mountains.  Variations in the hills and topographical features create an interesting visual element to which the eye is drawn.

ITW's simulation, below, minimizes the aesthetic impact of the tower by maximizing blending the gray tower into gray trees.



Ex. LH-4, p. 8

The tower would also be visible from nearby residences. ". . . There are portions of the

Gates/Bonner and Gandy parcels from which the Tower will be visible." Hodgetts PfT p. 8.

The Gates/Bonner property less than 1100 feet south of the proposed Tower includes a

post-and-beam hillside farmhouse built around 1793 by Wilson Carpenter and believed to be the

oldest surviving home in Ira—with 28 acres of land. Ex. NI-B-6. A friend of Wilson

Carpenter's, a mason named Preserved Fish, likely built the stone foundation and the massive

central chimney. The Carpenter family had a sawmill, powered by the brook that runs near the

house, and the remains of its foundation is still there. The place is a treasure; a unique and

precious historic property.



*This house (23, c.1790) was one of the first of many Cape Cod types to be built in Ira. Vernon Carpenter lived here in the mid 19th century, operating a sawmill on the brook nearby.*

ITW's lattice tower and antennae would be visible from this historic property.

Looking north from some portions of the Gates/Bonner property, the tower would be
directly in the view of a distant dramatic mountain. Ex. NI-B-6, -11, -12.



Tower

An industrial tower with antennas intruding into this beautiful landscape would be

shocking and offensive to the average person.

Views of the tower from portions of the Gandy property would be out of character with the area and would introduce a tall industrial structure into the views of mountains.

 — Tower

Half a mile south of Toppin Road and .90 miles from the project site according to ITW's simulation, the tower would be prominently visible from private property and Route 133. It is not known if the property owner is aware of the tower proposal.



Exhibit LH-4 p. 10

ITW's simulation minimizes the aesthetic effect by showing the gray tower with gray trees.



Parcel map of properties in the area surrounding the proposed tower, with topography.
It is likely that many landowners in the viewshed are unaware of the ITW tower proposal.
Red dot is approximate proposed ITW tower location.

The project would be visible from adjacent properties, properties overlooking the Ira valley up to two miles away, and a two-mile stretch of Route 133. It can be concluded that the effects on "overall perception," "sense of place," and "quality of life" of the area will be adverse.

**Conclusion of the first step of the Quechee Analysis**

The project has visibility from public and private vantage points and will have an adverse impact on neighboring and more distant properties, particularly with respect to open space and its lack of fitting into the surrounding context. Therefore, the second prong of the Quechee Analysis is conducted to determine if the adverse impacts are undue.

**Part 2 of the Quechee Analysis**

The second prong of the Quechee Analysis asks when an adverse impact is undue. Three

questions inform this analysis.

### 1.  Does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area?

The Public Utility commission considers "clear written community standards" discernable in

town and regional plans in assessing whether a project will have an undue adverse effect on

aesthetics.

The Ira Town Plan, adopted by the town Select Board April 21, 2020, states that "It is the

official policy of the community, with regard to future growth and development, to provide

standards of development to ensure that the Town's distinctly rural character and its scenic

viewsheds are protected and preserved . . . It is intended that the Plan be used in a positive

manner; as a tool in guiding the direction of growth in a way that is both economically feasible

and environmentally acceptable. The Plan, by identifying unique and fragile areas, or those

regions of high scenic, natural, or historic value, seeks to guide development by respecting both

the potentials and constraints offered by nature, balancing these as well as the current and long

term needs." Ex. NI-B-2 p. 3.

"Internet services in town are available through Comcast, VTel, and satellite. Ira has

taken the initiative of having fiber optic installed throughout the Town, and so has more reliable

internet than areas without. As a result of rapid industry growth, emerging technologies, and

industry permit leasing requirements, Vermont towns will see a sharp increase in applications for

telecommunications towers over the next several years. Given the industry's plans to increase its

presence in Vermont and the sometimes highly sensitive nature of telecommunications tower

proposals, it has become increasingly urgent that every Vermont town adopt regulations

specifically addressing siting and application requirements for these towers. Thoughtful regulations balance the desire for better communications facilities with the desire to preserve scenic landscapes and ensure safety in each community . . . Traditional tools that towns use to participate in the siting of cellular facilities is planning, adopting reasonable bylaws, and focusing on aesthetics, safety concerns (other than radiation) and character of the neighborhood." Ex. NI-B-2 p. 10.

"In the course of planning for Ira's future, it is important that the presence of high quality open space and scenic resources, broad scenic areas as well as scenic landmarks, are recognized and the integrity of such resources preserved. Scenic resources have aesthetic, historical and economic value. Siting of future construction, community facilities and infrastructure should always consider the potential impact on the aesthetic, as well as the physical health of the community. Wherever possible, development should be located and tailored to preserve the undisturbed integrity of Ira's quality scenic and open space resources. The undeveloped mountain peaks and ridgelines in Ira's Highland Conservation District, especially those close to municipal boundaries and described in the appendix to the Plan, define and frame the Town. They are prominent physical features which make up much of the Town's land mass and unique character, and are visible from many communities in the region. They provide the backdrop for a very rural and sparsely settled community that has no commercial land use and is therefore quite peaceful.

"Scenic resources have aesthetic, historical and economic value, enhancing the quality of life of Ira's residents. There are many pleasing views and vistas available to travelers on the Town's existing highways. Route 133 extends lengthwise through Ira valley, which contains a large portion of the Town's open and agricultural low lands; the southern portion of the valley is

flanked by steep, wooded ridges to the east and west. To the east is the ridge running along the

boundary with Clarendon, which includes Susie's Peak. To the west is Train Brook Ridge

running along the boundary with Middletown Springs. The West Road also provides travelers

with pleasing views of other working farms, yet from generally higher elevations, and in some

places, with long-range views across neighboring towns to Killington, Pico and Shrewsbury

peaks." Ex. NI-B-2 p. 30.

The Ira Town Plan, therefore, provides a clear written community standard by

recognizing Route 133 through the Ira valley as a scenic resource and stating "the integrity of

such resources preserved."

The Rutland Regional Plan adopted June 19, 2018 states that its goals for future land use

include "to protect the character of rural areas and resource areas" and "to protect the natural

environment and its economic, ecological, sociological, psychological and aesthetic benefits."

Ex. NI-B-3 p. 27.

"Development in low density areas should be unobtrusive and maintain the rural

character and scale of the locale." Ex. NI-B-3 p. 29.

"The Rutland Region has an abundance of highly scenic resources thanks to a landscape

that is dominated by rugged mountain ranges, clear streams, and fertile valleys . . . Another

distinguishing feature of the Region's scenery is its agricultural lands. Many of them occupy the

valleys between the two mountain ranges while others cling to the Region's many hillsides . . .

These scenic resources have not only attracted numerous residents over time, they also are a

major draw for visitors and a vital part of the Region's economic well-being." Ex. NI-B-3 p. 128.

While not specific to the Ira valley on Route 133, this tower project area fits the exact

description of the Regional Plan's goals to protect the character of rural areas, maintain the rural

character, and recognizes the economic and societal values of highly scenic resources of valleys

between two mountain ranges.

*Conclusion:* ITW's 183-foot tall lattice tower with antennas violates the clear, written

community standard in Ira's town plan which recognizes and seeks to preserve the integrity of

the Route 133 Ira valley that is the specific area visually impacted by the proposed tower.

**2.  Does the Project offend the sensibilities of the average person? Is it offensive or shocking because it is out of character with its surroundings or significantly diminishes the scenic qualities of the area?**

Under the Quechee test, a project will be found to offend the sensibilities of the average person

if the project is out of character with its surroundings or significantly diminishes the scenic

qualities of the area.[1] The perspective of an average person includes views from both adjoining

residences and from public and private vantage points. As noted in the *Rutland Renewable Energy*

*case*:

> In determining whether there has been an undue adverse impact, considering the sensibilities of the average person, the Board can and should consider all vantage points, including from private property.[2]

The location of the proposed tower coupled with the 170-foot structure plus 13 feet of

antennas, plus potential future antennas, and the steel lattice tower style would significantly

diminish the scenic beauty of the area and have undue adverse impacts on public and private

vistas of open agricultural fields with dramatic mountain backdrops.

---

[1] *Re: Pike Industries, Inc. and William E. Dailey, Inc.*, #1R0807-EB, Findings of Fact, Conclusions of Law, and Order at 18 - 19 (June 25, 1998); *Re: Nile and Julie Duppstadt, supra*, at 35; *and see, Re: Robert B. & Deborah J. McShinsky*, #3W0530- EB, Findings of Fact, Conclusions of Law, and Order at 9 (April 21, 1988), *aff'd, In re Robert and Deborah McShinsky*, 153 Vt. 586 (1990).

[2] In re Petition of Rutland Renewable Energy, LLC for Certificate of Public Good Pursuant to 30 V.S.A. § _248, et al. at p. 10.

The tower would be seen from a two-mile stretch of Route 133, which is identified in the town plan as a scenic resource to be preserved. Neighbors living in close proximity to the tower and further away have objected to this style and height of tower in this location. Ex. NI-B-7. The tower would interfere with scenic vistas of private landowners. There was no public notice of ITW's balloon test, and local landowners were denied access to the project site to conduct their own balloon test. A publicly warned balloon test would have enabled interested parties to commission their own simulations to determine if ITW's simulations are accurate, and to provide simulations in different seasons that more realistically depict the tower as built with five additional carriers leasing space.

Because the height of the tower is significantly above tree height by more than 100 feet, the tower would loom as an industrial structure in the midst of natural beauty and is totally out of character with the other elements of the surrounding area.

Adjoining landowners, neighbors and the average Vermonter who lives in the area and travels along Route 133 recognize that the specific location chosen by ITW is breathtakingly beautiful in all seasons. Ex. NI-B-8-12. The introduction of a metal lattice tower into this scenic rural setting would offend the sensibilities of the average person. The proposed tower's lack of harmony with its surroundings would be shocking and offensive to the average Vermonter and tourists who love this area.

*Conclusion:*  An industrial metal lattice tower in a scenic, rural valley would be shocking and offensive to the average person who lives, drives, or recreates in the area of the proposed tower. A reasonable person would conclude that ITW's tower is totally out of character with the natural scenic beauty of the area in the Ira valley on Route 133. Therefore, the adverse impact is undue.

**3. Have the applicants failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings?**

The third question of the Quechee analysis imposes an objective test to lessen adverse impact. Has the applicant taken generally *available mitigating steps that a reasonable* person would take to improve the harmony of the proposed project with its surroundings? If the applicant has failed to take mitigation measures to minimize the aesthetic impact of the project, its negative aesthetic impact is deemed *"undue."*[3]

Some generally available mitigations steps that may be undertaken to reduce adverse aesthetic impacts include: alternative technologies, alternative siting; alternative design; camouflaging; and collocation.

*Alternative Technology*: The proposal details no assessment of technological alternatives for improving private or public radio transmission, such as use of repeaters, or reliance on colocation of radio antennas or small cells. Nor, does the proposal demonstrate how it accords with or advances the public safety analysis of Vermont's 10-year Telecommunications Plan.[4]

Contrary to public hope or expectation, the project offers no detailed or concrete plan for immediate or future cellular or related-internet services. The project does not discuss colocation or collaboration opportunities with this initiative.

*Alternative Siting:* Alternative siting that limits visual impact is one mitigation step. The goal of effective sensitive siting is to maximize the technological benefits and minimize the aesthetic ills of sites. ITW has offered no other location to mitigate the unduly adverse aesthetic impact of a 170-foot tall lattice tower topped with 13-foot whip antennas in the Ira valley on Route 133.

---

[3] See, *e.g.*, *Re: Didace and Susan LaCroix, #3W0485-EB, Findings of Fact, Conclusions of Law, and Order* at 13 *(Apr. 27, 1987).*
[4] Exhibit NI-B-13.

*Alternative Design*:

- *Reduction in Height of Tower*

The petitioner is not open to lowering the height of the Tower. It remains unknown whether a lower tower at a different elevation would have been effective.

- *Monopole versus Lattice Tower*

One commonly recognized less visually intrusive structure is a monopole tower. The applicant is offering only a lattice tower. However, ITW's presentation includes examples of monopole towers. Ex. KD-5, pp. 20-21. No consideration was made of whether a monopole tower would reduce the undue adverse aesthetic impact.

- *Camouflaging of Tower*

Beyond suggesting that a gray color tower and lattice design would reduce visual impact, the applicant details no specific mitigation measures to camouflage or screen the proposed Tower to minimize the unduly adverse aesthetic effect.

- *Collocation*

ITW has provided no evidence to show that two-way radio service is needed along Route 133 in the Ira valley, or whether current service could be augmented by co-location of ITW's radio service with existing antennas that would mitigate the aesthetic effect of the proposed tower.

*Conclusion on Mitigation*:

A review of these five potential mitigation strategies suggests that the Petitioner failed to take generally *available mitigating steps that a reasonable* person would take to improve the harmony of the proposed project with its surroundings. As such, the adverse aesthetic impacts of the proposed Project are *undue*.

### Conclusion of 2nd Part of the Quechee Analysis

The project violates the Ira Town Plan's Clear Written Community Standard to preserve scenic resources on Route 133 in the Ira valley. The 170-foot tall tower with 13 foot antennas on top would be out of character with the area. The average person would find it is shocking and offensive. The applicant has not taken mitigating steps that a reasonable person would take to minimize the impacts. Therefore, the aesthetic effects of the proposed ITW lattice tower are unduly adverse.

### <u>Orderly Development of the Region</u>

What is Orderly Development? The Introduction to the Ira Town Plan lays a framework for how the it envisions the Town of Ira to develop in an orderly way: "It is the official policy of the community, with regard to future growth and development, to provide standards of development to ensure that the Town's distinctly rural character and its scenic viewsheds are protected and preserved. It states the goals, objectives, policies, and priorities for action that guide the community towards its vision for the future." Ex. NI-B-2 p. 3.

Municipal plans are used for a variety of purposes as outlined in the Ira Town Plan. Among them is this guidance, "The Plan should be given full effect in all appropriate regulatory proceedings, such as Act 250 and the Section 248 (Certificate of Public Good) process." Ex. NI-B-2 p. 3.

### <u>Orderly Development Findings of Fact</u>

42. The Project will provide coverage for Industrial subscribers living in, working in or passing through the Ira area to be able to use Industrial's network. Hodgetts PfT. P. 2
43. The telecommunications services that ITW will provide through the Project will primarily be targeted to business customers seeking a reliable, reasonably-price means of communicating between their offices and remote users." Hodgetts PfT p. 11

44. The deployment of ITW's service in Ira will also attract commercial development, especially for business that require reliable two-way mobile communications. Hodgetts PfT p. 11

45. Ira as "a very rural and sparsely settled community that has no commercial land and is therefore quite peaceful." Ex. NI-B-2 p. 30

46. The specific services provided by ITW on its ESMR network include voice calling, text messaging, and GPS integration for vehicle tracking. The latter is particularly important for school districts who need to know where all of their buses are at particular points in time. Response to comments p. 5

47. Ira does not have any public educational facilities, nor does the Town own any school buses or vans, and the Town does not currently provide transportation of students to any schools. Ex. NI-B-2 p. 13

48. In the course of planning for Ira's future, it is important that the presence of high quality open space and scenic resources, broad scenic areas as well as scenic landmarks, are recognized and the integrity of such resources preserved. NI-B-2 p. 30

49. Scenic resources have aesthetic, historical and economic value. Siting of future construction, community facilities and infrastructure should always consider the potential impact on the aesthetic, as well as the physical health of the community. Ex. NI-B-2 p. 30

50. Wherever possible, development should be located and tailored to preserve the undisturbed integrity of Ira's quality scenic and open space resources. Scenic resources have aesthetic, historical and economic value, enhancing the quality of life of Ira's residents. Ex. NI-B-2 p. 30

51. Route 133 extends lengthwise through Ira valley, which contains a large portion of the Town's open and agricultural low lands; the southern portion of the valley is flanked by steep, wooded ridges to the east and west. To the east is the ridge running along the boundary with Clarendon, which includes Susie's Peak. To the west is Train Brook Ridge running along the boundary with Middletown Springs. Ex. NI-B-2 p. 30

52. Over time, most current facilities (especially towers) will become obsolete and will need to be retrofitted or replaced by new structures. Communities throughout the Region should be aware of this cycle to ensure that the landscape is not dotted with unused or abandoned telecommunications facilities. Some towns have already taken steps to avoid this. For example, the Tinmouth zoning requires that old towers be disassembled and removed within a certain period of time. NI-B-3 p. 206

**Ira Town Plan's guidance on development and growth**

- It is the official policy of the community, with regard to future growth and

  development, to provide standards of development to ensure that the Town's

  distinctly rural character and its scenic viewsheds are protected and preserved

- It is intended that the Plan be used in a positive manner; as a tool in guiding the direction of growth in a way that is both economically feasible and environmentally acceptable.

- The Plan, by identifying unique and fragile areas, or those regions of high scenic, natural, or historic value, seeks to guide development by respecting both the potentials and constraints offered by nature, balancing these as well as the current and long term needs. Ex. NI-B-2 p. 3.

- Internet services in town are available through Comcast, VTel, and satellite.

- Ira has taken the initiative of having fiber optic installed throughout the Town, and so has more reliable internet than areas without. Ex. NI-B-2 p. 10.

- In the course of planning for Ira's future, it is important that the presence of high quality open space and scenic resources, broad scenic areas as well as scenic landmarks, are recognized and the integrity of such resources preserved. Scenic resources have aesthetic, historical and economic value. Siting of future construction, community facilities and infrastructure should always consider the potential impact on the aesthetic, as well as the physical health of the community. Wherever possible, development should be located and tailored to preserve the undisturbed integrity of Ira's quality scenic and open space resources.  Scenic resources have aesthetic, historical and economic value, enhancing the quality of life of Ira's residents.  Route 133 extends lengthwise through Ira valley, which contains a large portion of the Town's open and agricultural low lands; the southern portion of the valley is flanked by steep, wooded ridges to the east and west.  To the east is the ridge running along the boundary with Clarendon, which

includes Susie's Peak. To the west is Train Brook Ridge running along the
boundary with Middletown Springs. NI-B-2 p. 30.

- Economic growth should be targeted for certain areas of the Town and
  discouraged in others to promote a vibrant village center, maximize existing
  infrastructure, utilize multi-modal transportation means and preserve the rural,
  working and forest lands that surround the Town. NI-B-2 p. 35.

- the town's stated goals include: to "preserve agricultural land and open spaces"
  and to "avoid unplanned growth."  NI-B-2 p. 49.

The Applicant is required to submit relevant portions of the Town Plan. However, ITW

neglected to include the Scenic Resource section of the Ira Town Plan, below, that identifies the

specific location of this proposal as a Scenic Resource to be protected.

## Scenic Resources

In the course of planning for Ira's future, it is important that the presence of high quality open space and scenic resources, broad scenic areas as well as scenic landmarks, are recognized and the integrity of such resources preserved. Scenic resources have aesthetic, historical and economic value. Siting of future construction, community facilities and infrastructure should always consider the potential impact on the aesthetic, as well as the physical health of the community. Wherever possible, development should be located and tailored to preserve the undisturbed integrity of Ira's quality scenic and open space resources. The undeveloped mountain peaks and ridgelines in Ira's Highland Conservation District, especially those close to municipal boundaries and described in the appendix to the Plan, define and frame the Town. They are prominent physical features which make up much of the Town's land mass and unique character, and are visible from many communities in the region. They provide the backdrop for a very rural and sparsely settled community that has no commercial land use and is therefore quite peaceful.

Scenic resources have aesthetic, historical and economic value, enhancing the quality of life of Ira's residents. There are many pleasing views and vistas available to travelers on the Town's existing highways. Route 133 extends lengthwise through Ira valley, which contains a large portion of the Town's open and agricultural low lands; the southern portion of the valley is flanked by steep, wooded ridges to the east and west. To the east is the ridge running along the boundary with Clarendon, which includes Susie's Peak. To the west is Train Brook Ridge running along the boundary with Middletown Springs. The West Road also provides travelers with pleasing views of other working farms, yet from generally higher elevations, and in some places, with long-range views across neighboring towns to Killington, Pico and Shrewsbury peaks.

The Ira Birdseye Road in North Ira also affords travelers with excellent views of the steep mountains that flank that portion of Town. To the east is a long ridge extending from near Spruce Knob at the south end (where the boundaries of Ira, Poultney and Middletown Springs intersect) to Route 4A at the north end, which includes Herrick Mountain and the peak of Ben=s Slide. The undeveloped ridgelines lying along Ira's boundaries with Clarendon and Poultney are prominent viewsheds visible from many municipalities in Rutland County.

NI-B-2 p. 30.

**Rutland Regional Plan**

The Rutland Regional Plan outlines important standards, goals, and policies to guide orderly development of the region that align with the more specific policies of the Ira Town Plan to protect its scenic resources, specifically in the Ira valley on Route 133.

- goals for future land use "to protect the character of rural areas and resource areas"

- to protect the natural environment and its economic, ecological, sociological, psychological and aesthetic benefits. NI-B-3 p. 27.

- Development in low density areas should be unobtrusive and maintain the rural character and scale of the locale. NI-B-3 p. 29

- The Rutland Region has an abundance of highly scenic resources thanks to a landscape that is dominated by rugged mountain ranges, clear streams, and fertile valleys

- Another distinguishing feature of the Region's scenery is its agricultural lands. Many of them occupy the valleys between the two mountain ranges while others cling to the Region's many hillsides

- These scenic resources have not only attracted numerous residents over time, they also are a major draw for visitors and a vital part of the Region's economic well-being. NI-B-3, p. 128

The Rutland Regional Planning Commission submitted a letter in this case acknowledging the following:

1. The proposed project does not conform to the Ira Town Plan with regards to aesthetics and protection of scenic resources.

2. The proposed project will not add cell service to the area as there are no commercial carriers referenced in the application.

The ITW tower project is the perfect example of what town and regional plans are intended to address and give voice to local and regional planners and residents about how they envision their town and region will develop.  Through the town plan's specific language and the more general language of the regional plan, it is clear that the project will not promote the Orderly Development of the Region due to its lack of compliance with the town plan and with proprietary two-way radio service as the only service provided.

### Societal Benefit

According to the applicant, the Project is primarily a radio tower for use by private businesses and subscribers. "Industrial operates what is typically referred to as an Enhanced Specialized Mobile Radio (ESMR) System." ITW Application Narrative, p. 1.  The project proposal identifies its beneficiaries as "The telecommunications services that ITW will provide through the Project will primarily be targeted to business customers seeking a reliable, reasonably-price means of communicating between their offices and remote users." Hodgetts PfT. p. 11.  "The specific services provided by ITW on its ESMR network include voice calling, text messaging, and GPS integration for vehicle tracking. The latter is particularly important for school districts who need to know where all of their buses are at particular points in time." Response to Comments, p. 4.  It should be noted that Ira "does not have any public educational facilities, nor does the Town own any school buses or vans, and the Town does not currently provide transportation of students to any schools." Ex. NI-B-2 p. 13. Accordingly, few of the primary beneficiaries of this private corporate venture would be ordinary residents of the Ira region, nor people driving in cars – most of whom do not have or use two-way radios.

ITW has provided no information about its business customers who would use this tower in this location.  ITW has provided no information about available emergency services and

whether local and regional needs are already being met by other carriers and through antennas in

better, less obtrusive locations.

ITW claims that it "has obtained the commitment of the Rutland Regional Ambulance

Service ("Ambulance Service") to place its antennas and equipment on the tower ("Tower")

portion of ITW's proposed facility." Response to Comments, p. 1. It cites a letter from James A.

Finger, the ambulance service's Chief Executive Administrator, dated September 27, 2022

Exhibit KD-7. Finger's letter, however, does NOT express a firm commitment, but merely

"support" and interest in further information: "This letter is to show support for the project

located at 299 Toppin Road in the Town of Ira to improve communications. Regional

Ambulance would be interested in reviewing information regarding the possibility of improved

radio communications." The only "commitment" is on the part of ITW, which mistakenly refers

to "the Department" (likely meaning the St. Albans Police Department to which ITW has offered

a free antenna for the proposed Enosburgh tower) rather than the Regional Ambulance Service:

"In further communications with the Ambulance Service, ITW stated

its commitment to allow *the Department* to place its equipment on the

Tower rent-free." *(emphasis added)* Suppl. PfT. Delaney p 5.



The area proposed for ITW's tower is sparsely

populated.  See map at right using 2010 population

from. Route 133 runs from West Rutland through

Ira,Tinmouth and Middletown Springs to Pawlet.

https://maps.vermont.gov/vcgi/html5viewer/?viewer=vtmapviewer

The entirety of Route 133 is sparsely populated.  ITW asks the

PUC to approve a tower to be built on the speculation that up to five

other carriers will lease space on the tower. The likelihood of cellular telephone service

providers choosing to lease space on this tower in such a remote location is questionable.

   This type of tower in this location has societal costs that outweigh the very minimal and

unproven public benefit. Therefore, this lattice tower in this remote location for the purpose of

providing two-way radio service does not provide societal benefits that outweigh the tower's

undue adverse aesthetic effect, and should be denied.

## Legal Standard

Section 248a (c)(2) states:

> Unless there is good cause to find otherwise, substantial deference has been given to the
> plans of the affected municipalities; to the recommendations of the municipal legislative
> bodies and the municipal planning commissions regarding the municipal plan; and to the
> recommendations of the regional planning commission concerning the regional plan.
> Nothing in this section or other provision of law shall prevent a municipal body from
> basing its recommendations to which substantial deference is required under this
> subdivision (2) on an ordinance adopted under 24 V.S.A. § 2291(19) or bylaw adopted
> under 24 V.S.A. chapter 117 by the municipality in which the facility is located. A
> rebuttable presumption respecting compliance with the applicable plan shall be created
> by a letter from an affected municipal legislative body or municipal planning commission
> concerning compliance with the municipal plan and by a letter from a regional planning
> commission concerning compliance with the regional plan.
> https://legislature.vermont.gov/statutes/section/30/005/00248a
> The Municipal legislative bodies are the Ira Select Board and the Ira Planning

Commission. They have chosen to let the Town Plan speak for the town. The Regional

Planning Commission expresses concern that the project violates the Town Plan (Letter, Sept.

27, 2022). The Town Plan creates a clear written community standard to protect the scenic

resources of the specific area of the project, the two-mile stretch of Route 133 in the Ira valley

where the project would be visible, and which the town plan recognizes "and the integrity of

such resources preserved." Therefore, the Ira Town Plan's clear written community standard

creates a rebuttable presumption respecting compliance, and is entitled to be given substantial

deference.

## Conclusion

ITW is a Massachusetts company new to Vermont that intends to build out a network of towers throughout the state. The Ira project is the first tower ITW has proposed in southern Vermont.

Ira's experience with the ITW tower proposal is that the company's approach is not aligned with Vermont's community values. ITW has not met with the Ira Select Board or Planning Commission. ITW conducted a balloon float in March, 2022 without notification to adjoiners, and without public notice to the larger area of Ira where the tower would be prominently visible. ITW is required to submit "relevant portions" of the town plan with its application, but the company neglected to include the Scenic Resource section of Ira's Town Plan which is directly relevant to the application. ITW did not conduct an Aesthetics Analysis nor did they do a Quechee Analysis. ITW's four simulations minimize the aesthetic effects by maximizing the gray background of gray trees in March. ITW admits that the tower would be visible for a two-mile stretch of Route 133, from public vantage points such as the new Town Office, and from the private properties of Gates/Bonner, Gandy, Shapiro, and Lloyds.

ITW's tower would have an adverse aesthetic effect because it is not in harmony with its surroundings, its design is incompatible with the surrounding area, its color and design are not suitable for the context of the area, the tall metal tower would have a negative effect on open space, and the tower would be visible from many private and public vantage points. The tower's aesthetic effect would be unduly adverse because the project violates the Ira Town Plan's clear written community standard to preserve the scenic resources in the Route 133 Ira valley, the tower would be out of character with the area and shocking and offensive to the average person, and ITW has not taken steps to mitigate the aesthetic impacts that a reasonable person would

take to improve the harmony of the project with its surroundings.  The project has negligible

societal benefit as its primary beneficiaries are the landowner leasing the property and ITW's

customers for two-way radio business service.  As Ira has no commercial lands, few local

businesses, and a sparse population with no proof of local demand for such infrastructure, the

potential customers for this tower's business service appear to be few.  The societal benefit of

improved cellular telephone service could be provided by a less visually intrusive structure, or by

the use of existing structures.  ITW's business customers could also be served by a less visually

intrusive structure that does not violate the Ira Town Plan.

     For all these reasons, ITW's Ira tower should be denied.

     Respectfully submitted this 23rd day of December, 2022 by,

*/s/Stanley M. Shapiro*
Stanley M. Shapiro
2706 Rt. 133
Ira, VT. 05777
stanudaman@gmail.com
(802) 855-3209


On behalf of Neighbor Intervenors Stanley Shapiro, David Gates, Francis & Ellen Lloyd, Alta
Johnston, and Raymond Gandy, *pro se.*